UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 06-10116-RGS

UNITED STATES OF AMERICA

v.

ROBERT PROSPERI, GREGORY STEVENSON,
GERARD MCNALLY, MARC J. BLAIS,
JOHN J. FARRAR, and KEITH THOMAS

MEMORANDUM AND ORDER ON
DEFENDANT MCNALLY'S AND DEFENDANT STEVENSON'S
MOTIONS TO SUPPRESS AND
REQUESTS FOR EVIDENTIARY HEARINGS

November 2, 2007

STEARNS, D.J.

Defendants are charged with conspiracy to commit mail fraud, conspiracy to defraud

the government, and the making of false statements in connection with the construction

of the Central Artery Tunnel Project (CA/T).   Defendants McNally and Stevenson,

employees of Aggregate Industries, a major CA/T contractor, separately gave statements

to the Massachusetts State Police on June 29, 2005.  Both defendants have filed motions

to suppress, each maintaining that his statement was made without the benefit of Miranda

warnings and is therefore presumptively inadmissible.  See Miranda v. Arizona, 384 U.S.

436 (1966).[1]   Defendants seek an evidentiary hearing to bolster their claims.   The

---

[1]The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself."  While "admissions of guilt by wrongdoers, if not coerced, are inherently desirable," United States v. Washington, 431 U.S. 181, 187 (1977), the Supreme Court in Miranda "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under these circumstances are inadmissible unless the suspect is specifically informed of his Miranda

government argues that an evidentiary hearing is not warranted because, in the government's view, the statements were not a product of custodial interrogation. The facts as alleged will be construed in the light most favorable to defendants.

Stevenson Interview

Early in the morning of Wednesday, June 29, 2005, Massachusetts State Troopers John Morris and Katrina Mazzie went to defendant Stevenson's home in Boxford, Massachusetts. The troopers wore casual clothing. Although both carried firearms, their weapons were concealed. The troopers arrived at approximately 6:00 a.m. They approached Stevenson as he walked from his residence towards his car. The troopers identified themselves and told Stevenson that they wanted to speak with him about a grand jury investigation involving the CA/T. The troopers told Stevenson that he was "not in trouble" and was not under arrest. They asked if they could conduct the interview inside Stevenson's home. Stevenson led the troopers through the kitchen into the family room.[2] There the troopers and Stevenson sat on separate couches. Stevenson was seated nearest to the doorway leading to the kitchen.

A few minutes into the interview, Stevenson's wife came downstairs after hearing the family dogs bark. The troopers told Mrs. Stevenson that they had come to ask some

---

rights and freely decides to forego those rights." New York v. Quarles, 467 U.S. 649, 654 (1984).

[2]There is a disagreement over whether the troopers asked to go inside the residence or whether Stevenson "invited" them to do so.

questions of her husband.[3]   She left the room and waited in the kitchen a few minutes before returning upstairs.  The troopers continued the interview.  They asked Stevenson if he wanted to take the dogs outside because of their continued barking.

Later in the interview, the troopers told Stevenson that other Aggregate employees were also being questioned.  As the interview was coming to an end, Stevenson received a call on his company cell phone from Greg Fowler, the head of maintenance at Aggregate.  Stevenson spoke with Fowler in the presence of the troopers.  Fowler told Stevenson that law enforcement officers were executing a warrant at the Aggregate facility in Everett.  After Fowler hung up, the troopers asked Stevenson if he wanted to call his office to let it be known that he would be late for work.   In the troopers' presence, Stevenson called Chad Groff, his supervisor, and told him about the interview.

 A few minutes later, Groff called back and told Stevenson that he needed an attorney and should stop answering questions.  Stevenson relayed this advice to the troopers, who told him that he was free to continue the conversation.  Stevenson said that he had to keep his job in order to pay his bills.  The troopers again told Stevenson that he could continue speaking if he wanted.  Stevenson repeated the advice that he obtain an attorney.  The troopers then served Stevenson with a grand jury subpoena and left.

The troopers did not at any time advise Stevenson that he could refuse to answer their questions or that he was free to terminate the interview.  They also did not give Stevenson Miranda warnings.  The interview lasted sixty to ninety minutes.

---

[3]The government notes that the troopers did not prevent Mrs. Stevenson from staying with her husband.

McNally Interview

That same morning, Troopers Matthew G. Murphy and Michael Farley went to defendant McNally's home in Rockland, Massachusetts. They arrived in separate, unmarked cars. Both wore casual clothing. Their firearms were concealed. At approximately 6:00 a.m., McNally left his residence and began driving to work. As the troopers had not yet received orders to confront McNally, they followed him to the Aggregate facility in Waltham. While en route, they were instructed to proceed with the interview. At approximately 6:45 a.m., McNally arrived at the Waltham facility and exited his truck. Trooper Farley approached McNally, showed his badge, and identified himself as a State Trooper. Farley explained that he wanted to speak with McNally about Aggregate's deliveries of concrete to the CA/T project. McNally agreed to be interviewed in the parking lot.

When other workers began arriving, McNally asked if they could move to a more discreet location. He led the troopers to an office attached to a nearby garage bay. The office had one door, windows, and benches. Once inside, McNally took a seat. Farley sat next to him. Murphy stood at the door.[4] Farley conducted the interview while Murphy took notes. The room was not air-conditioned. The troopers complained several times of the heat. At some point, McNally became faint.[5] The troopers never advised McNally of his

---

[4]The government contends that neither trooper blocked the door and that all three men stood during the interview.

[5]The government maintains that McNally did not exhibit any visible signs of discomfort.

<u>Miranda</u> rights or that he was free at any time to stop answering questions.[6]  The interview lasted forty-five minutes.  The troopers served McNally with a grand jury subpoena before leaving.

## DISCUSSION

<u>Miranda</u> warnings are required only when an interrogation is "custodial."  <u>Miranda</u>, 384 U.S. at 444.  <u>Miranda</u> defined custodial interrogation as questioning "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way."  <u>Id.</u> at 444.   "[T]he custodial setting is thought to contain 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'"  <u>Minnesota v. Murphy</u>, 465 U.S. 420, 430 (1984) (quoting <u>Miranda</u>, 384 U.S. at 467).   Custody, however, is not solely a function of a formal arrest.  The ultimate inquiry "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (per curiam).

A defendant bears the burden of proving that he was in custody when an incriminating statement was made.  The test is an objective one.  "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994).  The test involves a variety of factors, including "whether the suspect was questioned in familiar or at least

_____

[6]According to the government, both troopers left the office at different times during the interview to use the bathroom, leaving the other trooper and McNally together to continue the interview.

neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001). The list, however, is not exclusive, nor is any single factor necessarily dispositive.[7]

Stevenson was questioned in the familiar setting of his own home. While the location in which an interview takes place is not conclusive, United States v. Mittel-Carey, 456 F. Supp. 2d 296, 306 (D. Mass. 2006), it is a significant, and at times, decisive factor. See Beckwith v. United States, 425 U.S. 341, 343, 347 (1976) (conversation with officers in defendant's home was "friendly" and "relaxed"). By contrast, none of the facts cited by Stevenson, however indulgently viewed, could have reasonably transformed the family room where the interview with the troopers occurred into a police-dominated, coercive environment. There were only two troopers present during the interview; both wore plain clothes; Stevenson was told that he was not under arrest; the troopers kept a respectful distance; Stevenson was seated next to the door; the troopers did not stop the questioning when Mrs. Stevenson was present or standing within earshot; they offered to let him leave the room to attend to his dogs; Stevenson was permitted to receive and make phone calls

---

[7]Some courts, for example, focus on the extent to which a suspect is confronted with evidence of his guilt. See e.g., United States v. Estrada-Lucas, 651 F.2d 1261, 1266 (9th Cir. 1980)

during the interview; the troopers did not use any deceptive tactics;[8] and they did not in fact arrest Stevenson.[9]

Stevenson makes much of the fact that neither trooper informed him that he was free to leave or to terminate the encounter, although this fact would be more relevant if the interview had taken place outside the home in a forbidding environment.  See Yarborough v. Alvarado, 541 U.S. 652, 665 (2004) (interrogation at a police station); but see United States v. Griffin, 922 F.2d 1343, 1355 (8th Cir. 1990) (an otherwise familiar setting like a home may be transformed into an oppressive and custodial environment by an overbearing police presence); Orozco v. Texas, 394 U.S. 324, 326 (1969) (defendant questioned while surrounded in his bed by four armed officers).  Stevenson also claims that when he "indicated that he wanted an attorney present, the troopers attempted to persuade him otherwise."  But the officers never told Stevenson that he could not contact an attorney; they only told him that he could continue the interview without an attorney present if he so chose.  When Stevenson repeated the advice that he obtain an attorney, the troopers broke off the interview.  In the totality of the circumstances, no reasonable person in Stevenson's place would have believed that he was in custody.  Therefore, no evidentiary hearing is required.

The McNally Interview

---

[8]According to Stevenson, it was deceptive for the troopers to tell him that he was not in any trouble, when they knew that search warrants were being executed at other locations in connection with the investigation.

[9]When the troopers asked Stevenson if he wanted to call his office to explain why he was tardy, they clearly signaled that they had no intention of placing him under arrest at the end of the interview.

McNally argues that his situation is similar to that of the defendant in <u>United States v. Mahmood</u>, 415 F. Supp. 2d 13 (D. Mass. 2006).  In <u>Mahmood</u>, a defendant charged with immigration marriage fraud made statements to ICE agents during an aggressive home interview.[10]  The court determined  that the defendant was in custody and that the agents' conduct created a custodial environment requiring the giving of <u>Miranda</u> warnings. McNally argues that he was questioned in an isolated office; that the exit was physically blocked by one of the troopers; that he was not permitted to use the bathroom; that the room was excessively hot; and that the questioning persisted even though he was flushed and felt faint.  <u>See</u> <u>United States v. Griffin</u>, 7 F.3d 1512, 1519 (10th Cir. 1993) (custody found where intense questioning took place in a confined office); <u>United States v. Carter</u>, 884 F.2d 368, 371-372 (9th Cir. 1989) (same); <u>United States v. Lee</u>, 699 F.2d 466, 468 (9th Cir. 1982) (per curiam) (hour long interview conducted by two agents in a closed car). The issue is whether a reasonable person in McNally's position would have felt deprived of any freedom of choice or maneuver.  Because essential facts concerning the conditions in the office and the aggressiveness of the trooper's conduct are in dispute, and because their resolution might well have a bearing on the outcome of the motion to suppress, an evidentiary hearing will be held in McNally's case.

<u>ORDER</u>

---

[10]In <u>Mahmood</u>, the ICE agents awoke the defendant from sleep; performed a protective sweep of the home immediately after entering; failed to offer the services of an interpreter despite Mahmood's thick foreign accent; accused <u>Mahmood</u> of lying; one agent repeatedly put his hand on Mahmood's shoulder, while another placed herself in front of Mahmood's phone when it rang.

For the foregoing reasons, Stevenson's motion to suppress and request for an evidentiary hearing is <u>DENIED</u>.   McNally's request for an evidentiary hearing is <u>ALLOWED</u>. The Clerk will calendar the hearing.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE